John Michael **TUOHEY**, Deceased, By Perrin D. McElroy, Administrator of His Estate, Plaintiff-Respondent,

v.

**NATIONAL INSURANCE UNDERWRITERS**, Defendant-Appellant.

No. 23682.

Kansas City Court of Appeals.

Missouri.

June 3, 1963.

Rodger J. Walsh, Linde, Thomson, Van-Dyke, Fairchild & Langworthy, Kansas City, for appellant.

Winn Thurman, Thurman, Thurman & Lafferty, Kansas City, for respondent.

BROADDUS, Presiding Judge.

This is an action based upon an insurance policy covering the loss of an airplane. Plaintiff had a verdict and judgment. Defendant appealed.

The deceased was the named insured under a Combination Aircraft Policy issued by the defendant-appellant, the National Insurance Underwriters, a reciprocal insurance exchange.

The policy insured an aircraft, a Piper Tri-Pacer, C.A.A. No. N2745-P, Model PA-22 which was built in 1955.

The aircraft was flown by deceased from Chicago to St. Louis, Missouri and then enroute to Kansas City, Missouri, it crashed near Chillicothe, Missouri, on March 31, 1957, and was destroyed. The deceased was killed with his wife in the crash.

Among the risks covered by the policy was "Coverage F—All Risks while in flight

—to pay for all physical loss of or damage to the aircraft while in flight * * *" which provided the limit of liability to be $5,500 less $150 deductible. The policy also contained the following exclusion:

"Exclusion... This policy does not apply... .
(a) Under Coverages A, B, C and H to any insured who operates or permits the aircraft to be operated, or under Coverages D, F and G, to loss while the aircraft is in flight by or with the permission of the Insured during or as a result of its operation: ..............
(3) under Instrument Flight Rule(s) (IFR) conditions unless the pilot possesses a valid Instrument Rating and is proceeding in accordance with Instrument Flight Rules: * * *"

The policy contained the following definition:

"....(J) Instrument Flight Rule(s) (IFR). The term 'Instrument Flight Rule(s) (IFR)' whenever used in this policy shall mean those rules governing Instrument Flight as established by the duly constituted agency(s) of the Federal Government having jurisdiction over Civil Aviation..."

The Instrument Flight Rules, Title 14, Code of Federal Regulations, Sections 60.30 to 60.41, are as follows:

"Aircraft shall comply with the following requirements as to ceiling and distance from clouds:

"(a) Within Control Zones. Unless authorized by air traffic control, aircraft shall not be flown when the ceiling is less than 1,000 feet, or less than 500 feet vertically and 2,000 feet horizontally from any cloud formation.

"(b) Elsewhere. When at an altitude of more than 700 feet above the surface aircraft shall not be flown less than 500 feet vertically and 2,000 feet horizontally from any cloud formation; when at an altitude of 700 feet or less

aircraft shall not be flown unless clear of clouds.

"Visibility—

"(a) Ground Visibility Within Control Zones. When the ground visibility is less than three miles, no person shall take off or land an aircraft at an airport within a control zone, or enter the traffic pattern of such airport, unless an air traffic clearance is obtained from air traffic control:

"(b) Flight Visibility Within Control Zones. When the flight visibility is less than three miles, no person shall operate an aircraft in flight within a control zone, unless an air traffic clearance is obtained from air traffic control:

"(c) Flight Visibility Within Control Areas. When flight visibility is less than three miles, no person shall operate an airceaft within a control area.

"(d) Flight Visibility Elsewhere. When outside of control zones and control areas, no person shall operate an aircraft in flight when the flight visibility is less than one mile.

"When aircraft are not flown in accordance with the distance-from-cloud and visibility rules prescribed in the visual flight rules, aircraft shall be flown in accordance with the instrument flight rules which requires that prior to take-off from a point within a control zone or prior to entering a control area or control zone, a flight plan shall be filed with air traffic control."

The deceased had no instrument rating at the time of the crash and did not file a flight plan before leaving St. Louis. He left St. Louis about 9:50 P.M. and his estimated time to arrive in Kansas City would be midnight.

Jack Jones, a pilot for 25 years and 15,000 hours of flying experience, was called by plaintiff as his witness. He identified defendant's Exhibit 1, the weather report, for the evening of the crash together with the flash advisory "that is put out when the weather gets into extreme conditions, * * for pilots to anticipate this bad condition." The weather report meant that Kansas City was below the minimum of Visual Flight Rules, a thousand feet ceiling and three miles visibility. He read pages 17 through 21 of defendant's Exhibit No. 2 which were the weather reports. The time on the reports is Eastern Standard time. At Lamoni, Iowa, north-northeast of Kansas City about 100 miles, the weather at 9:28 P.M. CST was two miles visibility and fog and about the same at 10:28 P.M. CST; at Kirksville at 9:28 P.M. CST it was four miles visibility and fog and lowering some; at Butler, Missouri, at the same time it was one mile visibility and sky obscured; at St. Joseph, Missouri, at the same time there was a seven hundred to six hundred foot ceiling, lowering, and visibility two and one-half miles with rain and fog; at Kansas City from 9:28 P.M. CST through midnight the ceiling was 600 feet, sky obscurement; rain and fog; at Vichy, Missouri, at the same time the ceiling went from 800 to 5500 feet and the visibility was 15 miles. Vichy is about 175 miles southeast of Kansas City. Jones testified that it was instrument flight rule conditions at Lamoni, Iowa; St. Joseph, Kansas City, and Butler, Missouri, from 9:28 CST to midnight on the night of the crash. Columbia was not instrument weather. It was his opinion that the chances of it being instrument flight conditions at Chillicothe at the time the deceased crashed were real good.

Mr. Jones testified that the Chillicothe Airport is in a control area and not in a control zone. The air space from the ground up to 700 feet is not considered within the control area. One may fly under Visual Flight Rules as long as he stays under 700 feet altitude, clear of clouds and has a mile visibility. The rules applying to this type of flight are different from those restrictions one finds when he enters a con-

trolled field (controlled zone) like the Municipal Airport in Kansas City.

Austin C. Vincent, a lawyer and private pilot, called by the plaintiff, learned in his inquiry that the deceased was advised by the St. Louis radio of the flash weather advisory and that it would be unwise for the deceased to take off and start the trip. It was his opinion, based upon the same weather reports and his investigation of the crash, that it was instrument weather over the whole state of Missouri that evening. The pilot was advised that the St. Louis radar showed thunderstorms west of St. Louis that night. At night you cannot see the weather coming as you can in the daytime. It was his opinion that it was instrument flying conditions at the time the deceased crashed near Chillicothe and also at Lamoni, St. Joseph, Kansas City and Butler, Missouri.

Robert Beebe, a consulting meteorologist, proprietor of Midwest Weather Service, who has done graduate work in meteorology and taught at the University of Chicago, and was an aviation forecaster for the United States Weather Bureau and has spent the last twenty-five years in forecasting and observation of the weather testified that he examined defendant's Exhibits 1 and 2, the weather reports, and it was his opinion that it was instrument flight conditions at Kansas City, St. Joseph, Lamoni and Butler, Missouri, on the evening of the crash at 9:30 P.M. CST until midnight. The weather was moving from west to east. Flash Advisory No. 5 issued by Kansas City indicated ceiling generally three to seven hundred feet, visibility two to four miles, intermittent rain and fog through Kansas and extreme West Missouri lowering locally to ceiling, sky obscured one-half mile, fog for brief periods, valid until 10:30 P.M. CST, and this flash advisory indicated instrument weather any place, in either control area, control zone, or any place else. It was his opinion that the visibility was less than three miles at Chillicothe between 9:30 CST and midnight. Generally visibility in the air is less than it is on the ground. It must be at least three miles in a control zone.

St. Louis tower and St. Louis ATCS gave deceased the Columbia, Kansas City and Butler, hourly weather report, the Columbia and Kansas City forecast and the Kansas City flash weather advisory which deceased acknowledged receipt of and advised he was proceeding to Kansas City.

Phillip E. Meadows, air traffic control specialist, St. Louis, radioed deceased the weather at St. Louis, and that there were general indications of Instrument Flight Rule conditions west of St. Louis. He could not stop deceased from taking off.

William E. Saucier, airways operation specialist, Federal Aviation Agency, St. Louis, advised deceased of the flash advisory which was potentially hazardous to flying, and that Kansas City was below VFR minimums.

Henry Felix Duggins, flight service specialist, Federal Aviation Agency, St. Louis, had no authority to stop deceased because the weather was forecasted to become worse at Kansas City area. Nancy Frances Grace, Bessie Mae Wilson and Adeline E. German, all of Chillicothe, Missouri, went to church together on the evening of the crash about 7:30 P.M. There had been a storm before and during the services and they left church after 10:30 P.M. to return home. The storm was terrific while they were in church. After church it was foggy and they saw a flash which appeared to be from three to five miles away and near where deceased crashed. It caused a big blaze. It was misting, hazy, raining and the windshield wipers were operating on their car. It was a severe storm, with the wind blowing and tree limbs down around town. They couldn't see the stars. It was hazy and foggy in the car lights as they drove along.

The aircraft was valued before the crash at $5,750 and there was salvage of $60. The jury's verdict was for $5290 which was $5500 less $150 deductible less the $60 salvage.

■ Defendant's first contention is that plaintiff failed to make a submissible case because "the policy excluded coverage for loss in flight under Instrument Flight Rule conditions unless the pilot possessed an instrument rating; the pilot did not have an instrument rating and the loss occurred in a flight under Instrument Flight Rule Conditions."

Plaintiff made a prima facie case by introducing the policy in evidence and showing "loss or damage to the aircraft while in flight." Foster v. Metropolitan Life Ins. Co., 233 S.W. 499, 500 (Mo.App.); Yarber v. Connecticut Fire Ins. Co., 10 S.W.2d 957 (Mo.App.); Dyer v. Kansas City Life Ins. Co., 188 S.W.2d 758 (Mo.App.). The burden was upon defendant to prove its affirmative defense that instrument flight rule conditions existed, making such type of flight mandatory; that such flight was being done in violation of the exclusion clause of the policy.

The weakness of defendant's position lies in its failure to comprehend control zone flights and flight elsewhere. According to the evidence, when one is not flying in a control zone, flight visibility is only required to be one mile minimum. In the instant case the flight was obviously made in an area where only one mile visibility was required for flight under 700 feet altitude. Defendant's whole case in the presentation of its affirmative defense that instrument flight rule conditions existed is bottomed on its contention that the flight was being conducted in a control zone requiring three mile visibility plus vague testimony of witness Beebe that visibility at Chillicothe was less than three miles. Defendant completely ignores the testimony of witnesses Grace and Wilson from which the jury could reasonably infer that visibility was from three to five miles.

Under the decisions we have cited above, where plaintiff has made a prima facie case and an affirmative defense is tendered, the case cannot be taken from the jury. The plaintiff has the right to have the jury pass upon the credibility of defendant's witnesses and the weight of their testimony, though uncontradicted. The court committed no error in overruling the motion for a directed verdict.

■ Defendant next contends that the court erred in refusing to allow it to read to the jury the inventory and appraisal filed in the Probate Court in connection with deceased's estate showing the claim against defendant to have been appraised at $1. We fail to see how defendant was in any way prejudiced by the court's ruling. That the airplane was totally destroyed was admitted and its value ($5750) was never in dispute.

■ Defendant also says that the court erred in refusing to permit it to read to the jury the portions of the depositions of three witnesses to the effect that deceased was lost before he landed at the St. Louis Airport and had to be landed by directional finding radio. Plaintiff objected "to everything up to the landing at St. Louis and not after the take-off or after the landing at St. Louis." In ruling the trial court stated: "The sole question—or the reason that defendant denies liability in the case is that it contends the plaintiff was engaged in instrument flying at the time of the crash. What happened from Chicago to St. Louis has no bearing in the lawsuit. At the time of his take-off in St. Louis and that part of the record that might pertain to information he did get concerning weather would be material to this case. Beyond that, it would not." We agree with that ruling.

■ Defendant next claims that the court erred in refusing to allow it to inquire on the voir dire examination if any member of the jury panel had an interest in the Missouri Credit Union. It appears that the Credit Union by reason of the fact that it held a mortgage on the airplane was named in the loss payable clause of the policy "as its interest may appear." It further appears that the mortgage had been paid from funds derived from insurance on

the life of deceased. In ruling the trial court said: "From what you tell me they (Credit Union) were paid off. They had an interest in the proceeds at the time the policy was written. They have no interest now. Therefore, the question is not proper and will not be permitted." That was the correct ruling.

■ Defendant's final contention is that the court erred in giving at plaintiff's request Instruction 1, in that it failed to negate the affirmative defense of the defendant contained in Instruction No. 4, and failed to hypothesize facts to show that plaintiff had fully complied with the terms of the policy.

Instruction 4 reads as follows:

"The Court instructs the jury that it is admitted that the deceased John Michael Tuohey on or about March 31, 1957, did not have an instrument flight rating and the Court further instructs you that under the terms of the policy mentioned in evidence that the policy does not apply to loss while the aircraft is in flight by the insured under instrument flight rule conditions unless the pilot possesses a valid Instrument Rating and is proceeding in accordance with Instrument Flight Rules, and you are further instructed that if you find and believe that on March 31st, 1957, before the deceased John Michael Tuohey left the Saint Louis Airport, he was advised of weather conditions along his route to Kansas City, if so, and if you further find and believe that the flight in the said weather conditions consti-

tuted operating the aircraft under instrument flight rule conditions, if so, and if you further find and believe that at the time of said crash, John Michael Tuohey was operating the aircraft under instrument flight rule conditions, if so, then your verdict must be for the defendant."

Perhaps Instruction No. 1 is not as definite as it should have been, but when it and Instruction 4 are read and construed together we fail to see how the jury could have been mislead. The rule governing the instant situation is re-stated in the case of McDaniel v. McDaniel, Mo., 305 S.W.2d 461, 467, 468, as follows:

" 'Instructions must be read and construed together'; and 'if the plaintiff's instruction, covering the whole case and authorizing a verdict, does require the finding of all essential elements of the plaintiff's case, but states some of these indefinitely or ambiguously or in language which might be misleading, then an instruction on the part of the defendants which clearly and specifically requires the finding of essential elements does not conflict with the plaintiff's instruction, but instead makes it clear and definite'; and so 'when all of the instructions thus harmonize and when read together correctly state the law, any such indefinite, ambiguous or misleading language in the plaintiff's instruction is cured by the other instructions.' "

Finding no error in the transcript prejudicial to defendant, the judgment is affirmed. All concur.